Robert C. Huntley ISB#894
Christopher F. Huntley ISB#6056
HUNTLEY PARK THOMAS BURKETT
    OLSEN & WILLIAMS LLP
250 So. Fifth Street, Suite 660
P.O. Box 2188
Boise, Idaho 83701
Telephone: 208-388-1230
Facsimile: 208-388-0234
Email: rhuntley@idahoatty.com

Sara Shepard ISB #5560
250 S. Fifth Street, 700
P.O. Box 1246
Boise, Idaho 83701
(208) 395-1405

Attorneys for Plaintiffs



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **Brenda Guerrero**, individually and as guardian ad litem of her minor children, Erica, Elisa and Bianca; **Stacie Butler-Putz**, individually and as guardian ad litem of her minor child, Jonathon; **Terri Sterling**, individually and on behalf of her minor child, Wendy; **John Newman and Mary Newman**, individually and on behalf of their children, Michael Thomas Newman and Christine Elaine Newman;<br><br>Plaintiffs,<br>v.<br><br>**The State of Idaho; The Honorable Dirk Kempthorne** as Governor of the State of Idaho; **et al.**,<br><br>Defendants. | Case No. CIV 00-578-S-MHW<br><br>**CONSENT DECREE AND JUDGMENT** |

This action was filed on October 4, 2000 for injunctive relief and certification as a Class

CONSENT DECREE AND JUDGMENT - 1


Action. By this action Plaintiffs seek judgment and order that the State of Idaho comply with the requirements under the Medicaid Statute, 42 U.S.C. §1396 et seq., and 42 C.F.R. §441.56 et seq., relative to screening Medicaid eligible children for elevated blood lead levels.

The Court entered its order certifying a Class Action on June 6, 2001 (Docket No. 12) and the case was set for a jury trial for January 13, 2003. Plaintiffs moved for Summary Judgment on October 10, 2002 (Docket No. 23) and Defendants filed a Motion on October 11th, 2002 for an Order Denying Plaintiffs' claim for injunctive relief and for an Order Entering Final Judgment on the basis of Defendants' allegations that the case is moot because the State is going to voluntarily comply with the federal statutes and regulations. Oral argument was conducted on the respective motions on the 21st day of November, after which the parties entered into mediation with the result that they have entered into a stipulation for a Consent Decree and Judgment as provided herein.

## FINDINGS OF FACT

1.  The Plaintiffs are children, and parents of children who now reside in the state of Idaho or who have in the recent past and relevant time period resided in the state of Idaho. Each child is eligible for Medicaid Services as determined by the Defendants. As such, each child is or was entitled to lead screening, and if needed, treatment services through the Medicaid EPSDT Program. Each minor child appears by and through his or her parent or next friend as guardian ad litem. Some of the children are members of minority groups.

2.  The Plaintiffs are: **Brenda Guerrero**, individually and as guardian ad litem of her minor children, Erica, Elisa and Bianca; **Stacey Butler-Putz**, individually and as guardian ad litem of her minor child, Jonathon; **Terri Sterling**, individually and on behalf of her minor child, Wendy; and **John Newman and Mary Newman**, individually and on behalf of their children, Michael

CONSENT DECREE AND JUDGMENT - 2

Thomas Newman and Christine Elaine Newman;

3. Defendants, **The State of Idaho; The Honorable Dirk Kempthorne** as Governor of the State of Idaho; **The Legislature of the State of Idaho,** by and through the Speaker of the House, and the President Pro Tempore of the Senate, Robert L. Geddes; and Karl Kurtz, as Director of the **Idaho Department of Health and Welfare,** are duly elected officials or departments of Idaho State Government and, as such, are responsible for implementing the requirements of the Federal Medicaid Act, including the requirement that states providing lead poisoning screening and treatment to Medicaid eligible children. The individual Defendants are sued in their official capacity.

4. Aware of the hazards posed to poor children by lead, Congress has required state Medicaid programs to provide children with comprehensive lead testing and treatment services through the Medicaid Act's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT). This action for declaratory and injunctive relief challenges the failure of the Defendants to comply with these mandatory requirements, which obligate the State of Idaho, as a participant in the Medicaid program, to:

(a) aggressively identify and inform poor families and children concerning the benefits of EPSDT, including lead screening and treatment, 42 U.S.C. § 1396a(a)(43), 42 C.F.R. § 441.56, HCFA, State Medicaid Manual part 5;

(b) screen all children for lead poisoning, using lead blood level assessments at 12 and 24 months and between 36-72 months of age if they have not been previously screened, 42 U.S.C. § 1395d(r)(1)(B); HCFA, State Medicaid Manual § 5123;

(c) provide health education and anticipatory guidance to the child and family regarding lead poisoning and lead poisoning prevention, 42 U.S.C. § 1395d(r)(1)(B);

(d) provide necessary diagnostic and treatment services to children who are diagnosed with elevated lead blood levels, including environmental investigations to determine the source of the lead poisoning, case management services, and medical treatment, 42 U.S.C. § 1396d(r)(5), 42 C.F.R. § 440.40(b);

(e) coordinate lead poisoning and prevention activities with other agencies, including Women, Infant and Children (WIC) programs, housing programs, state and local education programs, and lead poisoning prevention programs, 42 U.S.C. § 1396a(a)(53) 42 C.F.R. § 441.61; HCFA, State Medicaid Manual, §§ 5123.2.D, 5330.

## STATUTORY AND REGULATORY FRAMEWORK

5. Title XIX of the Social Security Act, commonly referred to as the Medicaid Act, provides medical assistance to individuals who lack the financial means to obtain needed health care on their own. 42 U.S.C. § 1396. Medicaid is partially administered by the federal government, under the aegis of the Health Care Financing Administration (HCFA) of the Department of Health and Human Services (HHS). Each state is at liberty to decide whether to participate in the Medicaid program, and all states do. The state and federal governments share responsibility for funding Medicaid. However, states must administer the program subject to mandatory federal requirements imposed by both the Medicaid Act and the guidelines of HHS. 42 U.S.C. § 1396a; Wilder, et al. v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513 (1990).

6. Since 1967, the Medicaid Act has included a mandate that states provide Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) services to children under age 21 who are covered by their Medicaid programs. In 1989, the law was amended to require the states to provide

to each covered child periodic check ups, called medical screens. By law, medical screening services "shall at a minimum include" a set of five components --

    (i) a comprehensive developmental history,

    (ii) an unclothed physical examination,

    (iii) immunizations, and

    (iv) laboratory tests (including lead blood level assessment appropriate for age and risk factors), and

    (v) health education (including anticipatory guidance).

42 U.S.C. § 1396d(r)(1)(B).

    7.    In 1989, the Medicaid Act was also amended to require the state Medicaid agency to provide to each covered child a broad range of EPSDT treatment services, described as:

> Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

42 U.S.C. § 1396d(r)(5). Among the diagnostic, treatment, and other measures described in subsection (a) are "case management" services, defined as "services which will assist individuals eligible under the plan in gaining access to needed medical, social, educational, and other services." 42 U.S.C. § 1396d(a)(19).

    8.    Beginning in September 1992, and as amended in April 1990, the Health Care Financing Administration established the following specific requirements for state Medicaid programs to follow for lead toxicity screening:

    (a) All children must receive a screening lead blood test at 12 months and 24 months of age;

    (b) Children between the ages of 36 months and 72 months of age must receive a lead blood test if they have not been previously tested;

    (c) A lead blood test must be used when screening Medicaid-eligible children;

CONSENT DECREE AND JUDGMENT - 5

(d) States cannot adopt a statewide plan for children that do not require lead testing for all Medicaid-eligible children;

(e) If the lead level is greater than or equal to 10 $\mu g/dL$, providers are to use their professional judgment to determine the course of treatment, including follow up tests and environmental investigations to determine the source of the lead.

HCFA, State Medicaid Manual, § 5123.2

9. On April 13, 1998, the Director of HCFA sent a letter to state Medicaid Directors again informing them that all Medicaid eligible children are required to be tested at 12 and 24 months, and children aged 36 to 72 months are to be tested if they have not been previously tested. Letter from Sally K. Richardson, Director, Health Care Financing Administration, to State Medicaid Directors (Apr. 13, 1998).

10. The federal Medicaid laws require state Medicaid agencies to coordinate activities with respect to lead poisoning and lead poisoned children with other agencies, including Women, Infant and Children (WIC) programs, housing programs, state and local education programs, Head Start, and state lead poisoning prevention programs. 42 U.S.C. § 1396a(a)(53) (regarding coordination with WIC); 42C.F.R. § 441.61; HCFA, State Medicaid Manual, §§ 5123.2.D, 5330.

11. The Medicaid EPSDT statute and administrative guidelines require states to inform all Medicaid eligible persons under the age of 21 of what services are available under the EPSDT program, the benefits of preventive health care, where the services are available, how to obtain them, and that necessary transportation and scheduling assistance is available. 42 U.S.C. § 1396a(a)(43); 42 C.F.R. § 441.56; HCFA, State Medicaid Manual § 5121.

12. When it amended the EPSDT provisions in 1989, Congress required state Medicaid agencies to submit reports to the Secretary of HHS "in a uniform form and manner established by the Secretary....," 42 U.S.C. § 1396a(a)(43)(D), and it ordered the Secretary to set annual participation goals for each state for participation of children in EPSDT. 42 U.S.C. § 1396d(r). The Secretary of HHS has established reporting requirements and participation goals. HCFA, State Medicaid Manual, §§ 5360, 2700. Pursuant to these requirements, states must annually report to HCFA the number of eligible children receiving screening services. A child is to be reported as having received a medical screen only if the complete set of five screening activities, including lead blood level assessments, has been delivered to the child. Id.. The Secretary of HHS established a goal that 80 percent of the eligible children in each state would participate in the medical screening offered through the EPSDT program by fiscal year 1995. Id. at § 5360.

13. EPSDT thus stands as a broad directive that states which accept federal Medicaid subsidies must actively reach out to children and their families and inform them of the availability of EPSDT and the benefits of preventive care; timely screen children, particularly children under age six, for lead poisoning using lead blood tests; and effectively provide comprehensive diagnostic and treatment services to treat any condition detected.

14. In 1999, the Division of Medicaid retained Dr. Young as a medical consultant. (Shepard Aff. Ex. 7, p. 5 & 6 (Young Depo.)). In March of 2001, Dr. Young was tasked by the Mediaid Division with working on getting Medicaid children tested. (Id. at 9 & 15-16).

15. In September 2001, the Division of Medicaid contracted with the Southwest District Health (SDH) to perform a pilot project testing children at the District Health offices. (Shepard Aff. Ex. 12, p. 14-5 (Gunderson Depo)). The pilot project was undertaken in response to this law suit.

CONSENT DECREE AND JUDGMENT - 7

(Id. at 14 (Gunderson Depo)). The Pilot project commenced in September 2001 and ended May 2002. Southwest District Health Director Mr. Gunderson canceled the project. (Id. at 13-14 and Depo Ex. 45 & 46 (Gunderson Depo)).

16. Initially the project had only one testing machine available in only one location. Shortly before the project was cancelled, a second testing machine was placed in a second location. There was only one individual who could administer the lead testing. (Shepard Aff. Ex. 12, p. 39, 40, 53, 69 (Gunderson Depo)). The project was deemed a failure because the Health District was not breaking even financially on administering the test. (Id. at 28, 47-49 and Depo. Ex. 46 (Gunderson Depo)). Part of the failure of the project was due to the Division failing to get Doctors to refer patients to District Health to be tested. (Id. at 26 and Depo. Ex. 46 (Gunderson Depo)). One hundred and ninety-four Medicaid children were tested through the pilot project. (Id. at 27 (Gunderson Depo)). There were in excess of 1,000 children in the pool of children eligible and appropriate to be tested for lead served by Southwest District Health. (Id. at 43, 33-35 (Gunderson Depo)).

17. Prior to the pilot project, SDH did no lead testing on its Medicaid Children and did not advise parents of the importance of lead testing. (Shepard Aff. Ex. 12, p. 15, 76, 77 (Gunderson Depo)). Following the cancellation of the Project, SDH does no lead testing. (Shepard Aff. Ex. 12, p. 76 (Gunderson Depo)). The state did not seek information from SDH as to what it would cost to continue the pilot project without SDH losing money. (Shepard Aff. Ex. 12, p. 57-9 (Gunderson Depo)).

18. Mr. Gunderson, Director of SDH, is unaware of any current lead testing of Medicaid Children in Idaho. (Shepard Aff. Ex. 12, p. 76 (Gunderson Depo)). The only testing of children is

being done in Coeur d'Alene by Panhandle District Health. (Shepard Aff. Ex. 12, p. 77 (Gunderson Depo)).

19. Prior to 2002, the Department maintained that it could not or would not inform physicians serving Medicaid eligible children that lead testing was required under the Medicaid statute. (Shepard Aff. Ex. 7 p. 32-33 (Young Depo); Ex. 8 p.71-73 (Moritz Depo): Ex. 10 p. 45 - 47 (Schultz Depo); and Ex 12 p. 23 (Gunderson Depo)).

20. The Health Division has left it up to the doctors to order lead test or not. (Shepard Aff. Ex 10 p. 46 -47 (Shultz Depo)). The Division of Health believes that there isn't a significant risk of lead poisoning in Idaho and therefore has not encouraged doctors to test children for lead poisoning. (Id.)

The only lead testing related requirements recognized by Mr. Schultz, the Administrator, Division of Health, is the requirement that any test that results in a finding of a lead blood level over 10 micrograms per deciliter must be reported. (Shepard Aff. Ex 10 p. 11 (Shultz Depo)). He does not recognize that there are any children living in the Silver Valley -- e.g., Medicaid Children – for whom lead testing is mandated. (Shepard Aff. Ex 10 p. 8, 11 (Shultz Depo)). Medicaid division does not know how many Medicaid children have elevated lead blood levels and no one connected with the state has ever asked for that information. (Shepard Aff. Ex 10 p. 10 (Shultz Depo)). Mr. Schultz is aware the American Academy of Pediatrics recommends testing of children at the ages of one and two. (Shepard Aff. Ex 10 p. 22 (Shultz Depo)). As of July 2001, the Health Division had not undertaken a campaign to educate health care providers of the importance of lead testing. As of July 2001, nowhere in the state outside the Silver Valley were children were being tested for lead poisoning. (Shepard Aff. Ex 10 p. 12 (Shultz Depo)).

CONSENT DECREE AND JUDGMENT - 9

Only four studies of lead poisoning have been performed in Idaho since 1993. (Shepard Aff. Ex 10 p. 13 (Shultz Dep)). None of those studies were preformed in response to Medicaid requirements. The studies of lead poisoning done in Idaho were done on such small numbers of participants that the findings of the studies are not viewed as valid. (Shepard Aff. Ex 10 p. 52 (Shultz Depo)).

21. Pamela Mason, Acting Bureau Chief for Bureau of Medicaid Programs, knows nothing about what is being done to implement lead testing of Medicaid Children. (Shepard Aff. Ex 13 p. 4, 13 (Mason Depo)). She understands that DeeAnne Moore is working on it. (Id.) She states that Dr. Young is working on contracts with health districts and on getting "encouragement" out to the doctors. (Shepard Aff. Ex 10 p. 14 (Shultz Depo)).

DeeAnne Moore, former Chief of Medicaid Policy Bureau, doesn't know about any plans to publicize the lead testing but states that Dr. Young knows. (Shepard Aff. Ex 11 p.4, 5, 80 (Moore Depo)). Dr. Young has mentioned a plan to let parents know they have options where to get lead testing done. (Shepard Aff. Ex 11 p.81 (Moore Depo)).

22. Prior to 2002, the department maintained that it could not or would not inform physicians serving Medicaid eligible children that lead testing was required under the Medicaid statute. (Shepard Aff. Ex. 7 p. 32-33 (Young Depo); Ex. 8 p.71-73 (Moritz Depo); Ex. 10 p. 45 - 47 (Schultz depo); Ex 12 p. 23 (Gunderson depo)).

23. After the pilot project failed in spring of 2002, Dr. Young began affirmatively stating to doctors that they must test Medicaid eligible children and make contracts with doctors to place lead testing equipment in their offices. (Shepard Aff. Ex. 15 p.6, 8 (Young 3rd depo). In August of 2002, he was still in the process of entering such agreements with doctors. (Shepard Aff. Ex. 15 p.6,

CONSENT DECREE AND JUDGMENT - 10

10 (Young 3rd depo)).

24. State Agencies are under extreme pressure to cut costs. (Shepard Aff. Ex. 14). Personnel and services are being cut by Health & Welfare to meet the demands for costs reductions being placed upon it. (Id.)

25. Since 1992, the State of Idaho has had the following numbers of children eligible for Medicaid (Shepard Aff. Ex. 1, 2, 3 and 9):

| Year | Under one year | one up to six years |
|---|---|---|
| 1992 | 7,599 | 23,641 |
| 1993 | 8,435 | 27,849 |
| 1994 | 8,732 | 31,164 |
| 1995 | 8,357 | 31,275 |
| 1996 | 8,256 | 29,556 |
| 1997 | 11,901 | 27,651 |
| 1998 | 11,613 | 27,032 |
| 1999 | 11,911 | 27,802 |
| 2000 | 13,380 | 32,460 |
| 2001 | data not produced despite requests | |

26. Since 1992, the State of Idaho has had the following numbers of Medicaid eligible children actually tested for lead poisoning through Medicaid (Shepard Aff. Ex. 4 and 5):

| Year | Between 1 and 2 | between 2 and 3 | between 3 and 6 |
|---|---|---|---|
| 1992 | 11 | 9 | 13 |
| 1993 | 66 | 26 | 55 |
| 1994 | 89 | 34 | 84 |
| 1995 | 30 | 19 | 27 |
| 1996 | 23 | 10 | 29 |
| 1997 | 38 | 12 | 34 |
| 1998 | 73 | 13 | 24 |
| 1999 | 122 | 12 | 27 |
| 2000 | 76 | 11 | 30 |
| 2001 | 39 | 7 | 8 |
| 2002 (partial) | 26 | 45 | 28 |

CONSENT DECREE AND JUDGMENT - 11

27. Prior to 2000, the Department of Health and Welfare sent no documents to the parents of Medicaid eligible children promoting the performance and importance of testing children for lead poisoning. (Shepard Aff. Ex 6, Request for Documents No.4).

28. As of July 2001, the Department of Health and Welfare sent notices to parents of children who missed a "Well Baby Check" or "Well Child Check" but no notices specifically for a child who missed a timely lead screening. (Shepard Aff. Ex. 6, Request for Documents No. 4 and Response; Ex. 8 p. 44-46 (Moritz Depo).

29. Prior to 2000, the Department of Health and Welfare sent no documents to Medicaid healthcare-providers promoting the performance and importance of testing all Medicaid eligible children for lead poisoning. (Shepard Aff. Ex. 6 Request for Documents No. 3 and Response; and Ex. 10 p. 45-46 (Schultz depo)).

30. As of 2001, the state has provided no lead remediation services to any child through the Medicaid program. (Shepard Aff. Ex. 8, p. 34-5 and 48 (Moritz depo); Ex. 11 p. 64-65, 82 - 83 (Moore depo).

31. In December 2000, the Department began developing a "Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Schedule Guidelines" for State of Idaho Medicaid providers. It had not been distributed to health-care providers as of July 2001. (Shepard Aff. Ex. 8 p. 24 - 28 (Moritz depo) and Ex. 9).

32. The Department has never been asked to generate nor has ever generated of its own accord, data on the rate of elevated lead blood levels among Medicaid eligible children in the State of Idaho or data on all Medicaid children tested for lead poisoning. (Shepard Aff. Ex. 10 p. 8 - 9, 27, 55 - 6 (Schultz depo); Ex. 11 p 76 - 7 (Moore depo)).

Based upon the foregoing Findings of Fact, the Court enters its Conclusions of Law as follows:

## CONCLUSIONS OF LAW

1. The State of Idaho does not effectively inform children and their families of lead poisoning prevention; or of screening and treatment benefits regarding lead poisoning available through EPSDT and how to obtain them.

2. In FY 1995, Idaho failed to meet the 80% participation goal in EPSDT, including lead testing set by the Secretary of HHS. Over the succeeding years, the State has failed to meet the participation goal.

3. The State of Idaho is not providing environmental investigations through Medicaid to determine the source of the lead poisoning to children who have been identified with elevated lead blood levels.

4. The State of Idaho is not providing through Medicaid comprehensive case management services to children who have been identified (or should have been identified) with elevated lead blood levels.

5. The State of Idaho is failing to assure that children eligible for EPSDT obtain lead blood tests in a timely manner. The State's failure to implement EPSDT lead screening as required by federal law is causing it to fail to provide health care, diagnostic services, treatment, and other measures described in the Medicaid Act (42 U.S.C. §§ 1396d(r) and 1396d(a)) to correct or ameliorate defects and physical and mental illnesses and conditions that young children suffer as a result of lead poisoning.

6. The State of Idaho is violating mandatory Medicaid provisions which require it to: (a)

ensure that Medicaid eligible children receive medical screening that includes lead screening, lead blood testing of young children, and health education and anticipatory guidance regarding lead poisoning and lead poisoning prevention; (b) provide or arrange necessary health care, diagnostic services, treatment and other measures to correct or ameliorate plaintiffs' defects and physical and mental illnesses and conditions brought on by elevated lead blood levels, including environmental investigations to determine the source of lead poisoning and case management services; and (c) coordinate activities with other agencies, including Women, Infant and Children (WIC) programs, housing programs, state and local education programs, Head Start, and state lead poisoning prevention programs.

7. By violating the Medicaid provisions, the State has denied and will deny to Plaintiffs and the Class members, their rights, privileges, and immunities secured by the laws of the United States.

8. These violations of the Medicaid provisions have caused and will cause Plaintiffs to suffer irreparable injury in that they have been and will be denied necessary information and outreach regarding EPSDT lead poisoning services, EPSDT screening, and follow up diagnostic and treatment services, with detriment to their health and well-being.

9. Plaintiffs have no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by the Defendants' policies and practices.

10. The Defendant Idaho Legislature has failed to provide adequate personnel and funding for the State to meet its responsibilities.

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court enters its Judgment, Order, and Consent Decree for injunctive relief as follows:

Case 1:00-cv-00578-MHW   Document 47   Filed 01/16/03   Page 15 of 18

## CONSENT DECREE AND JUDGMENT

1. The Defendants are and have been in violation of the federal Medicaid requirements identified herein above.

2. The Defendants are prohibited from violating the rights of the Plaintiff class as set forth above, and are required to take such actions as is necessary to remedy these violations, including implementation of an EPSDT program that includes: (a) outreach and informing of Medicaid eligible children and their families regarding the lead prevention and treatment services that are available through EPSDT, 42 U.S.C. § 1396a(a)(43), 42 C.F.R. § 441.56, HCFA, State Medicaid Manual part 5; (b) health education and anticipatory guidance regarding lead poisoning and lead testing of all Medicaid eligible children at 12 months and 24 months of age and between the ages of 36 months and 72 months of age, if they have not been previously tested, 42 U.S.C. § 1395d(r)(1)(B); HCFA, State Medicaid Manual § 5123; (c) follow up testing and diagnostic services for children with elevated lead blood levels, including environmental investigations to determine the source of the lead poisoning, 42 U.S.C. § 1396d(r)(5), 42 C.F.R. § 440.40(b); (d) follow up treatment services for children with elevated lead blood levels, including case management services and medical (physical and mental) health care, 42 U.S.C. § 1396d(r)(5), 42 C.F.R. § 440.40(b); (e) coordination of lead poisoning prevention activities and treatment of children with elevated lead blood levels with other entities, including Women, Infant and Children (WIC) programs, housing programs, state and local education programs, Head Start, and state lead poisoning prevention programs, 42 U.S.C. § 1396a(a)(53) 42 C.F.R. § 441.61; HCFA, State Medicaid Manual, §§ 5123.2.D, 5330.

3. Defendants will implement the following specific actions, in addition to all other reasonable and proper actions necessary to implement this Decree.

    (A) Ensure that State Medicaid Healthcare Providers explicitly understand that Federal law requires Blood Lead Screening for Medicaid eligible children and that the providers' participation in the Medicaid program requires compliance with the Federal law and regulations.

    (B) Ensure that State Medicaid Healthcare Providers understand that Medicaid will provide reimbursement for Blood Lead Screening as well as for follow-up services for children identified with elevated blood lead levels.

    (C) Continue to provide information to Healthcare providers regarding Medicaid Blood Lead Screening policies and the data which justifies them.

    (D) Ensure that healthcare providers receive appropriate Medicaid EPSDT program reimbursement and capitation rates for blood lead screening and follow-up services.

    (E) The State Medicaid program will take the lead in insuring that the appropriate testing and other services occur as required under this Decree for all areas of the State of Idaho.

    (F) Ensure that in cases where Medicaid eligible children have been identified with elevated blood lead levels, they receive environmental follow-up in addition to other components of case management.

    (G) Ensure that Medicaid Healthcare providers understand that, in cases

where Medicaid eligible children have been identified with elevated blood levels, environmental follow-up and other components of case management will be appropriately reimbursed by Medicaid.

(H) Measure healthcare provider performance on blood lead screening, give feedback to providers, and implement quality-control measures to promote lead screening and ensure follow-up care.

(I) Ensure that State information systems provide tracking of blood lead screening and prevalence of elevated blood lead levels among children enrolled in Medicaid.

(J) Establish, continue, and maintain partnerships between Medicaid and other programs which serve children enrolled in Medicaid to ensure these children receive appropriate services.

(K) Provide appropriate reimbursement for generally accepted medical testing technology necessary to accurately determine blood lead levels in children enrolled in EPSDT testing.

3. Plaintiffs are awarded their reasonable fees, costs, and expenses, including reasonable attorney's fees, authorized by 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and/or attorneys fees under the Private Attorney General Doctrine for the prosecution of this action (which attorneys fees and costs totaling $21,949.10 as of January 7, 2003).

DATED this 14 day of ＿＿＿＿＿＿＿＿＿, 2003.

Mikel H. Williams
United States Magistrate Judge

dkh

United States District Court
for the
District of Idaho
January 16, 2003

* * CLERK'S CERTIFICATE OF MAILING * *

Re:   1:00-cv-00578

I certify that I caused a copy of the attached document to be mailed or faxed to the following named persons:

Robert Huntley, Esq.   1-208-388-0234
HUNTLEY PARK THOMAS BURKETT OLSEN & WILLIAMS
PO Box 2188
Boise, ID  83701-2188

Sara Shepard, Esq.
PO Box 1246
Boise, ID  83701

David W Lloyd, Esq.   1-208-334-2830
OFFICE OF ATTORNEY GENERAL
Civil Litigation Division
PO Box 83720
Boise, ID  83720-0010

Clinton E Miner, Esq.
OFFICE OF ATTORNEY GENERAL
PO Box 83720
Boise, ID  83720-0010


_____Chief Judge B. Lynn Winmill
_____Judge Edward J. Lodge
_____Chief Magistrate Judge Larry M. Boyle
\_\_✓\_\_Magistrate Judge Mikel H. Williams

Visiting Judges:
_____Judge David O. Carter
_____Judge John C. Coughenour
_____Judge Thomas S. Zilly


Cameron S. Burke, Clerk

Date:  1-16-03                                BY:  _____
                                                   (Deputy Clerk)